Frederick H. Prince v. Commissioner.
Frederick H. Prince v. Commissioner
Docket No. 7496.
United States Tax Court
1946 Tax Ct. Memo LEXIS 138; 5 T.C.M. (CCH) 588; T.C.M. (RIA) 46168; July 17, 1946
*138 Francis B. Kenney, Esq., and Ernest A. Jenckes, Esq., 1310 Turks Head Bldg., Providence, R.I., for the petitioner. J. T. Haslam, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding involves a deficiency of $193,980.27 in income tax for the calendar year 1940. The sole issue is whether the respondent erred in disallowing a bad debt deduction in the amount of $270,000 claimed by the petitioner. Findings of Fact The parties have filed a stipulation of facts and those facts are incorporated herein by this reference. Other facts are found from the evidence adduced at the hearing. The facts are summarized below. The petitioner is an individual who resides at Newport, Rhode Island. For many years he has been the president of and a substantial stockholder in the Chicago Stock Yards Company. On July 1, 1931, the petitioner executed and delivered to The First National Bank of Boston the following guaranty agreement: In consideration of the extension by The First National Bank of Boston to Hoosac Mills Corporation of a current line of credit of Two Hundred and Fifty Thousand ($250,000) Dollars at any one time outstanding, *139 pursuant to the provisions of Article 5 of a certain Loan Agreement dated May 27, 1931, between Associated Textile Companies and The First National Bank of Boston and others, said credit to be available to Hoosac Mills Corporation at any time within two (2) years from date, I, Frederick H. Prince of Boston, Massachusetts, guarantee due and prompt payment to said The First National Bank of Boston of all loans made by said Bank to said Corporation under said credit, hereby waiving demand notice and protest. WITNESS my hand and seal this first day of July 1931. F. H. Prince The above guaranty agreement was delivered to the bank pursuant to a provision of a loan agreement between several banks, hereinafter referred to, and Associated Textile Companies, a voluntary association made up of Hoosac Cotton Mills Co., New Bedford Cotton Mills Corporation, and the Butler Mills Co., which agreement provided, among other things for the raising of $1,000,000 new capital by the enlarged company; for the payment of one-half of all amounts due the banks by the respective companies and an extension of time by the banks for the payment of the balance of the bank loans; that a line of credit in the *140 amount of $250,000 be obtained under an arrangement suitable to The First National Bank of Boston and that the express provisions of the agreement be met. Under the plan a new corporation known as Hoosac Mills Corporation emerged. It raised $1,000,000 in new money through the issuance of its preferred stock. Bank loans totaling $1,525,000 were reduced by payments totaling $862.500, leaving $662,500, which was assumed by the new corporation. The petitioner actively participated in the formation and consummation of the plan of organization of the Hoosac Mills Corporation and at all times material thereto was financially interested in its success either directly as a stockholder or indirectly by reason of his interests and investments in F. H. Prince & Company, Inc., and Chicago Stock Yards Company. During the two years beginning July 1, 1931, The First National Bank of Boston loaned Hoosac Mills Corporation a total of $250.000, represented by four notes, two of which in the aggregate amount of $125,000 matured June 12, 1933, and the other two, aggregating the same amount, matured July 3, 1933. These are the notes described in the guaranty agreement. Hoosac Mills was unable to *141 meet the notes at the maturity date and The First National Bank of Boston refused any extension thereof unless the petitioner would renew his guaranty. Accordingly, on May 29, 1933, in consideration of an extension of the notes, the petitioner executed and delivered to the bank a new guaranty agreement. On Ociober 2, 1933, the bank extended the maturity date of the four notes by taking two new notes, each in the amount of $125,000, dated October 2, 1933, and maturing 14 days after date. On May 29, 1933, at the time the second guaranty was executed, the petitioner had no interest as an individual in any of the capital stock or other securities of Hoosac Mills Corporation, but Chicago Stock Yards Company then owned 4,834 shares of its $7 cumulative preferred stock and petitioner was president of that company and owned 40 per cent of its outstanding shares. The remaining 60 per cent was owned by F. H. Prince & Co., Inc., all of whose shares were in turn owned by an irrevocable trust known as the "F. H. Prince Trust" established June 3, 1932, by petitioner. On October 7, 1933, a creditors' petition was filed against Hoosac Mills Corporation in the United States District Court for the *142 District of Massachusetts, and William M. Butler, president of Hoosac Mills, was appointed temporary receiver. A little later Butler and James A. McDonough, a vicepresident of the Chicago Stock Yards Company, were appointed permanent receivers. In September 1939, the petitioner, at the request of The First National Bank of Boston and in consideration of the bank's refranining from pressing a suit against him on the guaranty, executed a new agreement under which he agreed to make full payment upon demand. On March 28, 1940, The First National Bank wrote petitioner requesting payment by May 1 of that year of $250,000 principal and $82,395.84 interest, making a total of $332,395.84. About April 30 the bank agreed to cancel and discharge the guaranty upon prompt payment of $250,000 principal and $20,000 interest, or a total of $270,000, which is the amount here in controversy. On that date the Chicago Stock Yards Company paid petitioner $270,000 and carried said payment in suspense on its books. On May 1 the petitioner paid the $270,000 to the bank in discharge of his guaranty agreements. The bank delivered to petitioner an instrument releasing him from all obligations under the guaranty *143 and it endorsed the notes to petitioner and delivered them to him. The petitioner delivered the notes to the Stock Yards Company on that same date without endorsement. After May 1, 1940, but before the end of that year, the Chicago Stock Yards Company charged the entire $270,000, plus an additional $30,000 which it had paid petitioner on April 30, 1940, to salary paid petitioner. Both that company and the petitioner accounted for the $300,000 in their 1940 Federal tax returns as salary paid to and received by him. Petitioner had been president of the Stock Yards Company for 18 years and except for 1940, his salary from that company had never exceeded $100,000. Upon final audit the Chicago Stock Yards Company was allowed a deduction as salary for $100,000 of the amount paid petitioner. Two hundred thousand dollars of the claimed deduction was disallowed. On February 6, 1942, The First National Bank of Boston executed and delivered to petitioner a written instrument assigning to him the notes and the bank's claim against Hoosac Mills in the receivership proceeding. On November 2, 1942, petitioner, at the request of Stock Yards, endorsed the notes to Stock Yards, which entered them *144 on its books at the nominal value of $10. A court decree entered March 31, 1944, authorized and directed the receivers to pay in cash all claims against Hoosac Mills proved for an amount less than $15,000 and to issue receiver's certificates aggregating $949,385.66 in payment of the $699,385.66 principal amount of notes held by the banks, and $250,000 principal amount of the notes assigned by The First National Bank of Boston to the petitioner. The petitioner assigned the receiver's certificates to Stock Yards which received payments aggregating $250,000 in 1944 and 1945 from the receivers. On July 31, 1931, immediately afterthe consolidation, the balance sheet of the Hoosac Mills Corporation reflected total assets of some $6,840,000, of which just short of $5,000,000 was represented by land, buildings, machinery and equipment. Its liabilities amounted to just under $1,000,000. The liability account was balanced by an entry of some $5,888,000 in capital stock and surplus. As of October 7, 1933, immediately prior to the receivership proceeding, its balance sheet indicated current assets of about $820,000, miscellaneous assets amounting to about $335,000, and fixed assets, land, *145 buildings, and machinery, some $4,327,000. Total assets amounted to about $5,482,000. Current liabilities were reflected at just short of $1,500,000 and other miscellaneous liabilities of about $242,000 were listed. The balancing entry of about $3,743,000 represented capital stock. At this time there was a deficit in the capital stock of $1,872,000. The opening balance sheet per the books of the receivership, as of October 7, 1933, reflected total assets of some $10,077,000. This represented a write-up based on appraisal. Fixed assets were listed at the increased value of $9,299,714. On the liability side, the receivers assumed direct liability for an item of some $77,000 only. This sum represented an amount due under a machinery purchase contract. A balancing entry slightly in excess of $10,0000,00 represented the net receivership property. During the period from October 7, 1933, to March 1, 1941 (the fiscal year end nearest to December 31, 1940) the receivers sustained operating losses, before depreciation and without regard to losses sustained on disposals of fixed assets, of about $1,196,472. During the same period the receivers disposed of fixed assets carried on their books *146 at $2,927,379 for approximately $307,000. Between October 7, 1933, and March 1, 1941, the net receivership property decreased as the result of sales and write-downs from a little more than $10,000,000 to less than $4,480,000. During the same period the receivers purchased new equipment in the amount of some $516,000. In the period from March 1, 1941, to June 2, 1945, the net receivership property as carried on the books was increased from $4,478,000 to $5,099,000. During the same period, assets carried on the books at $1,297,557 were disposed of for some $299,603. During this period it purchased new equipment amounting to some $446,000. On June 2, 1945, the depreciated value of the fixed assets on the basis accepted for Federal income tax purposes, was $1,418,692. That value was adopted by the directors at the termination of the receivership. Between March 1, 1941, and June 2, 1945, the receivers had net earnings, before depreciation and before losses on disposals of fixed assets, of some $2,662,945. On March 1, 1941, which is the fiscal year end closest to December 31, 1940, the fixed assets were carried on the receivers' books at about $5,316,000. Total assets were shown as *147 $6,328,473. Liabilities amounted to about $1,800,000. Net receivership property was carried at $4,478,576. In addition, pre-receivership claims at that time were $1,046,000. If the receivers had included in their operating results the amount of depreciation on fixed assets and the amount of their losses on disposals of fixed assets, their operating loss for the period from October 7, 1933 to March 1, 1941, would have been increased from $1,196,000 to more than $3,630,000. The book value of the fixed assets of the receivers at March 1, 1941, as determined for Federal income tax purposes, would be $1,995.000. Upon a forced sale the fair market value of the machinery and equipment in 1940 was $613,330. Between 1933 and 1940, the bank creditors of the corporation charged off and were allowed a deduction for the entire sum of $699,385.66 due them as pre-receivership creditors. The American Viscose Company, one of the receivers' largest creditors in 1940, offered in that year to settle ts claim of more than $800,000 for $400,000, but the receivers were unable to accept the offer. On November 26, 1940, that company was advised by Edward R. Hale, general counsel for the receivers, that *148 if the Hoosac Company was forced to liquidate at that time it was extremely doubtful whether the creditor would realize more than 60 per cent of its claim. The claim of the American Viscose Company, which was a creditor of the receivers, ranked ahead of the claims of petitioner and the other general pre-receivership creditors. In 1940 the American Viscose Company had charged off $400,000 of its claim and had been allowed a deduction for it. In 1940 the receivers could not obtain a R.F.C. loan. On December 31, 1940, the petitioner's claim against the corporation was worthless. The corporation was in no position, as a going concern, to meet its liabilities. A forced sale of the assets would not have produced revenue sufficient to enable the company or receivers to pay anything on pre-receivership claims. Petitioner's claim was uncollectible, unsalable, and constituted a bad debt suffered in 1940. In his 1940 return the petitioner claimed a bad debt deduction in the amount of $270,000. The respondent disallowed the deduction on the ground that the petitioner's claim was not worthless in that year. Opinion ARUNDELL, Judge: This controversy poses no question as to the bona fides *149 of the debt, nor as to the amount. The sole issue is whether the debt was worthless in 1940 so as to entitle the petitioner to a deduction therefor. The applicable statute is section 23(k), Internal Revenue Code. The respondent takes the view that since the Hoosac Mills Corporation was a going concern during the taxable year and that since it did not * in fact in later years discharge its indebtedness, the petitioner may not be allowed the claimed deduction from gross income. Worthlessness is a question of fact. As indicated in our findings, the evidence here has satisfied us that petitioner's claim was uncollectible and worthless at the close of 1940. During that year the current assets of the receivers amounted only to about one-half as much as did current liabilities. In addition to the liabilities assumed or incurred by the receivers, there were other debts of more than a million dollars which were due and payable. The credit of the receivers was lost. A Reconstruction Finance Corporation loan could not be obtained. In these circumstances it is obvious *150 that as a going concern the corporation could not even pay off the receivership creditors in 1940. Nor does it appear that the petitioner would have been able to realize anything whatsoever upon his claim had the fixed assets of the company been liquidated. The general counsel for the receivers, although expressing hope for the future and seeking indulgence from the American Viscose Company which had offered to settle the debt of the receivers for 50 cents on the dollar and was insisting on liquidation when that offer could not be accepted by the receivers, informed the company that if they forced a liquidation it was doubtful that they would receive in excess of 60 per cent of their claim. It appears that all of the prereceivership creditors, except petitioner, had already written off and been allowed a deduction covering the amount of their claims. Even the Viscose Company had written off one-half of its claim. It seems clear that upon a forced sale of the assets of the Hoosac Company in 1940, the petitioner would have realized nothing. Such a showing brings the debt within the scope of the statute as is indicated by the respondent's Regulations noted in the margin.[1] The law impresses *151 no requirement that a taxpayer be an "incorrigible optimist." United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, and the general requirement that losses be deducted in the year sustained calls for a practical, not a legal, test. Lucas v. American Code Co., 280 U.S. 445. The petitioner is not required to establish beyond the possibility of doubt that nothing would ever be realized upon the claim. Farmer v. Commissioner, 126 Fed. (2d) 542; Forbes v. Commissioner, 62 Fed. (2d) 571; Clark v. Welch, 140 Fed. (2d) 271, and DeLoss v. Commissioner, 28 Fed. (2d) 803. The right to a bad debt deduction in the year in which it is sustained is not affected by the fact that recoupment is made at some subsequent *152 time. In Burnet v. Sanford & Brooks Co., 282 U.S. 359, the Court pointed out that each year stands alone and that where an amount deducted in one year is recovered in a later year the deduction and the recovery are required to be treated as separate items in the respective years. See also Regulations 111, section 29.23(k)-1, where it is stated that amounts subsequently received on account of a bad debt previously allowed as a deduction from gross income are to be included in the gross income in the year recovered except to the extent excludible under section 22(b)(12). The circumstances which were responsible for lifting Hoosac Mills out of the difficult position it was still in as late as 1940 had not yet arisen. It follows that the petitioner is entitled to a bad debt deduction in the amount claimed and it is so ordered. Decision will be entered for the petitioner. Footnotes
*. Apparently the word "not" should be omitted, although it appears in the original copy. - CCH.↩
1. Treasury Regulations 111: Sec. 29.23(k)-1. * * * * *
Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for the purpose of deduction. * * *↩